**In re ADOPTION OF S.P.**

**Appeal of G.P., Natural Father.**

Superior Court of Pennsylvania.

Argued June 7, 2011.

Filed Aug. 31, 2011.

Mari A. Hathaway, Washington, for appellant.

Erin W. Dickerson, McMurray, for appellee.

Joyce A. Hatfield–Wise, Washington, for participating party.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., MUSMANNO, BENDER, GANTMAN, DONOHUE, ALLEN, LAZARUS and OLSON, JJ.

OPINION BY DONOHUE, J.:

G.P. ("Father") appeals from the trial court decree entered on June 24, 2009, which granted the petition of Washington County Children & Youth Social Services ("CYS" or the "Agency") for the involuntary termination of Father's parental rights to S.P. who was born in May, 2005. Father is incarcerated and has been since prior to S.P.'s birth. The record is unclear as to how much prison time, if any, Father has yet to face, although he was eligible for parole in August 2009 and had a clean prison record at the time of the termination hearing in March 2009.

The issue presented is whether reasons other than the fact of Father's incarceration provide the basis for the termination of Father's rights pursuant to 23 Pa.C.S.A. § 2511(a)(2). After a careful review of the record, including uncontroverted evidence of Father's efforts to establish and maintain a relationship with the child since her birth and his unassisted efforts to prepare himself to assume parental responsibilities and to enter the work force, we reverse.

The relevant facts and procedural history of this case are as follows. Father is the natural father of S.P., who was born in May of 2005. Father was 19 years old at the time of S.P.'s birth. B.D., biological mother ("Mother"), was 17 years old at the time of S.P.'s birth. S.P. is Father's only child. Father has been incarcerated since December of 2004 based on his arrest for, and then a plea of guilty to, a third degree murder charge. On January 10, 2006, Father entered his guilty plea and was sentenced to five to 10 years of imprisonment for the unintentional but reckless shooting of his adoptive-father when Father was fiddling with a gun.

The family became involved with CYS in 2005, when CYS filed a merit petition alleging that Mother tested positive for THC and was involved in a domestic assault where S.P. was present. Following a hearing, S.P. was adjudicated dependent on December 19, 2005. S.P. was placed with Mother, who at the time was herself a dependent child in foster care. Trial Court Opinion, 6/24/09, at 1–2.

During the first seven months of S.P.'s life, S.P.'s mother brought S.P. to visit Father on six occasions while he was incarcerated in the Washington County Prison. N.T., 3/25/09, at 15–16. On January 13, 2006, Father filed a petition for a contact visit in anticipation of his transfer to a state correctional facility. The trial court granted Father's request. *Id.* at 2. On February 27, 2006, after Father was transferred to the state correctional facility, Father again petitioned for a contact visit, and a hearing was held on March 27, 2006. The trial court denied Father's petition, citing safety concerns and the exposure of such a young child to the prison environment. *Id.* At that time, the trial court also noted that Father had no preexisting bond with nine-month-old S.P. and observed that the Father was seeking to "establish a relationship with [S.P.] rather than continue an existing relationship." *Id.* Father appealed the order. The appeal was quashed, upon a motion from the Agency, as Father's Concise Statement of Matters Complained of on Appeal was not filed in a timely manner.[1] *Id.*

S.P. remained in foster care with Mother until Mother reached the age of majority. On July 12, 2007, CYS filed an Emergency Shelter Petition, alleging that the Agency was unable to make contact with the family. At that time, Mother indicated that she would like to sign her rights to S.P. over to her mother. *Id.* Following a hearing, the trial court ordered S.P. to remain in kinship care placement with Maternal Great–Aunt, and ordered Mother to participate in a variety of services. *Id.*

In 2007, N.D., S.P.'s half-sister, was born and placed immediately in foster care. On November 7, 2007, N.D. was adjudicated dependent, and N.D. and S.P. have remained in placement together since the adjudication.

On September 9, 2008, Mother voluntarily relinquished her parental rights to both of her daughters. S.P.'s permanency

---

1. The record in this case, which does not contain the docket of proceedings in juvenile court, does not reflect whether Father was represented by counsel in connection with the appeal.

placement goal remained reunification with Father,[2] notwithstanding his incarceration. In December of 2008, CYS filed a petition recommending that S.P.'s goal be changed to adoption. On December 12, 2008, the trial court granted CYS's petition and changed S.P.'s goal to adoption. This Court affirmed the goal change order on September 15, 2009. *In re S.P.*, 986 A.2d 1292 (Pa.Super.2009) (unpublished memorandum).

On January 13, 2009, CYS filed a petition to terminate Father's parental rights to S.P. The termination hearing took place on March 25, 2009. At that hearing, Father testified that he makes $20.00 per month in prison, and he uses that money to pay off fines and save money in preparation for his eventual release. N.T., 3/25/09, at 30. He has therefore not provided financial support for S.P. since he has been in prison. *Id.* Father sends presents, makes birthday cards for S.P., and sends letters to her from prison. *Id.* at 31–32. The record includes various handwritten letters from Father to S.P. as well as hand-made birthday cards and drawings. *Id.* at Father's Exhibit B. S.P. sent Father a page with her handprints on it and other artwork. *Id.* 70–71, Father's Exhibit C. S.P. enjoyed the presents she received from Father. *Id.* at 180.

Father's minimum sentence was to end in August of 2009, six months after the termination hearing, and he was eligible for parole at that point.[3] *Id.* at 34. While in prison, Father voluntarily took anger management, violence prevention, victim awareness, and parenting classes. *Id.* at 37. Father took pre-vocational training to qualify himself for HVAC repair work upon his release. *Id.* Father also learned basic computer skills while in prison. *Id.* at 37, 73. Father has become a tutor for other inmates in the HVAC training program. *Id.* at 71. Father has maintained a clean prison record at SCI Somerset, with the exception of some warnings for minor violations such as sleeping in too late. *Id.* at 38. As a juvenile, Father was adjudicated delinquent on a burglary charge. *Id.* at 19. Father smoked marijuana as a teenager, but does not have a history of drug or alcohol abuse. *Id.* at 86.

Jerdean Beatty ("Beatty"), a caseworker for the Agency, testified that the Agency did not ask Father to comply with any service plan. *Id.* at 131. The Agency did not create a service plan for Father because of the length of Father's incarceration. *Id.* at 132. Beatty acknowledged that it is possible for a parent to build a bond with a child while the parent is incarcerated if they have regular visits. *Id.* at 140. Beatty further acknowledged that Father did not have the opportunity to form a bond with S.P. through visits because court orders prevented visits. *Id.* Beatty was aware that Father had voluntarily taken part in the various prison programs, and that he had no record of getting into trouble while in prison. *Id.* at 144–45. Beatty acknowledged that Father made more of an effort to maintain a relationship with S.P. from prison than Beatty had observed in any of her other cases. *Id.* at 147. Likewise, Beatty acknowledged at the goal change hearing[4] that she believed Father would be capable of parenting S.P. if he had the opportunity. N.T., 12/5/08, at 39.

2. *See* 42 Pa.C.S.A. § 6351.

3. A Washington County Assistant District Attorney testified that prisoners convicted of third degree murder generally serve 65–70% of their maximum sentence. *Id.* at 52.

4. The transcript of the goal change hearing was received as an exhibit at the termination hearing. N.T., 3/25/09, at 5–6.

With regard to S.P., the record reflects that she is doing reasonably well with her foster parents and that she enjoys living with her half-sister. N.T., 3/25/09, at 126. S.P. is a special needs child who suffers from some behavioral issues, including pulling out her own hair. *Id.* at 126–27. Also, S.P. occasionally becomes aggressive toward her half-sister. *Id.* at 135. S.P. exhibits some symptoms consistent with autism, though it is unclear whether she actually is autistic. *Id.* at 136, 160–61. In any event, Father, were he eventually to assume custody of S.P., would need to take responsibility for getting S.P. to numerous appointments. *Id.* at 158. Father, who has had no in person contact with S.P. for three years, is reluctant to accept the fact that S.P. is a special needs child. *Id.* at 151.

Regarding the circumstances of Father's incarceration, Father testified that he was playing with a gun and accidentally shot and killed his adoptive father. *Id.* at 42. The Washington County ADA who prosecuted the case stated:

> [I]t appeared that [Father] had been fiddling with that gun throughout the weekend, he probably fiddled with that gun in that room and killed his father as a result of that. Do I believe he specifically intended to kill his father? No. But did he commit an extremely reckless act? Absolutely.

*Id.* at 54. Father's five to 10 year sentence was in the mitigated guideline range. *Id.* at 52.

Following the March 25, 2009 termination hearing, the trial court granted CYS's petition for involuntary termination

of Father's parental rights to S.P. on June 24, 2009. On July 23, 2009, Father filed both a timely notice of appeal and a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

Father raises fourteen issues [5] on appeal which, in essence, raise two substantive challenges to the termination decree:

I.  The Trial Court erred in granting the Petition to Involuntarily Terminate the Parental Rights of the Natural Father under 23 Pa.C.S.A. Section 2511(a)(2) where CYS failed to prove by clear and convincing evidence that anything other than his incarceration prevents him from fulfilling his parental obligations.

II. The Trial Court erred in granting the Petition to Involuntarily Terminate the Parental Rights of the Natural Father in that CYS failed to prove by clear and convincing evidence that the statutory grounds for termination best serves the needs and welfare of S.P. under 23 Pa.C.S.A. Section 2511(b).

Father's brief at 4–7.

■ The standard and scope of review applicable in termination of parental rights cases are as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.

---

5. We observe that Father's Statement of Questions Involved does not comply with Pa. R.A.P. 2116. Under Rule 2116(a), the statement shall be no more than two pages, and each question must be followed by the trial court's answer. Father's statement is four pages and the questions are not followed by an answer. Father's statement does, however, encompass all of the considerations required for an analysis under 23 Pa.C.S.A. § 2511(a)(2) and (b). Since Father's failure to adhere to the Rules of Appellate Procedure has not substantially hampered our review, we will not find waiver.

Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004) (*en banc*), appeal denied, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super.2002) (internal citations omitted).

■ The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super.2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000) (*en banc*). If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa.Super.2004). The termination of parental rights is controlled by statute. *In re*

*Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super.2006).

■ Mindful of the above principles, we address Father's appeal from the trial court's order granting CYS's petition to terminate Father's parental rights. The trial court found that CYS had met its burden of proof as to 23 Pa.C.S.A. § 2511(a)(2).[6] Section 2511(a)(2) provides:

**§ 2511. Grounds for involuntary termination**

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse and neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

■ To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super.2003). The grounds for termi-

---

**6.** CYS petitioned for termination pursuant to § 2511(a)(1) and (2). Trial Court Opinion, 6/24/09, at 3.

nation of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super.2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* at 340.

The instant case requires us to analyze the impact of Father's incarceration on his parental rights. We therefore begin with a review of the law pertaining to the effect of incarceration in a proceeding to terminate parental rights. The Pennsylvania Supreme Court held more than thirty years ago that incarceration alone is not a sufficient basis for termination of parental rights. *In re McCray*, 460 Pa. 210, 216, 331 A.2d 652, 655 (1975). The *McCray* Court wrote as follows:

> However, a parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*Id.* *McCray* affirmed an order terminating parental rights pursuant to the predecessor to current § 2511(a)(1). *Id.* at 218, 331 A.2d at 656. The above-quoted language is still used today in analyzing the effect of a parent's incarceration under both § 2511(a)(1) and (2). *See, e.g., In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super.2010) (quoting *In re B., N.M.*, 856 A.2d 847, 855–56 (Pa.Super.2004)); *In re I.G.*, 939 A.2d 950, 953 (Pa.Super.2007) ("[W]ith respect to failure to perform parental duties under subsection (a)(1), as well as incapability under subsection (a)(2), the fact of incarceration alone cannot support termination. A parent's absence and failure to support a child due to incarceration is not conclusive on the issue of whether the parent has abandoned the child.").

The rationale for the rule that incarceration alone is not a sufficient basis for termination of parental rights was set forth in *Welker's Adoption*, 50 Pa. D. & C. 573 (Clinton County 1944), a case cited favorably in *McCray*. *McCray*, 460 Pa. at 216 n. 8, 331 A.2d at 655 n. 8. At the time of the trial court's decision in *Welker*, the law provided that "the consent of the parents to an adoption is necessary, but the consent of a parent ... who has abandoned the child, is unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact." *Welker*, 50 Pa. D. & C. at 576. Abandonment at that time was defined as "any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claim to the child." *Id.* at 577–78 (quoting *Weinbach's Appeal*, 316 Pa. 333, 339, 175 A. 500, 502 (1934)).[7] The *Welker* court reasoned that the commission of a crime that leads to incarceration (in that case, for a minimum of ten years) does not by itself demonstrate a parent's settled purpose to forego parental rights. *Id.* at 578–80.[8]

---

**7.** *See also,* Act of April 4, 1925, P.L. 127 (repealed).

**8.** The rationale set forth in *McCray* and *Welker* is in accord with the United States Supreme Court's subsequent opinion holding

In between *Welker* and *McCray*, our legislature enacted the Adoption Act of 1970, which expanded the grounds for termination of parental rights. *See Jones Appeal*, 449 Pa. 543, 547, 297 A.2d 117, 119 (1972). Prior to the 1970 Act, abandonment, as described in *Welker*, was the only basis—other than consent—upon which parental rights could be terminated. Section 311 of the Adoption Act of 1970 was the predecessor of current § 2511 and contained substantially similar language, and thus set forth a much broader set of circumstances that could lead to termination of parental rights. *Id.* Section 311(2) of the 1970 Act contained language identical to that of current § 2511(a)(2).[9] *See id.* at 546, 297 A.2d at 119.

Thus, the rule that incarceration alone is not a sufficient basis for terminating parental rights, as stated in *McCray*, has been in effect with no substantial change for nearly 40 years. The same can be said for the statutory language set forth in § 2511(a)(2). Nonetheless, application of the *McCray* rule, particularly in cases involving § 2511(a)(2), has proven difficult, inasmuch as a parent's incarceration is obviously an "incapacity" that precludes day-to-day interactions and activities normally attendant to a parent-child relationship.

As noted, the Pennsylvania statute does not specifically address the effect of incarceration on the termination of an incarcerated person's parental rights.[10] However, the Adoption Act was amended, effective May 2007, to provide that grounds for termination of parental rights exist where the parent has been convicted of the murder (18 Pa.C.S.A. Chapter 25), aggravated assault (18 Pa.C.S.A. § 2702) of one of his or her own children, or attempt, solicita-

---

that, because parental rights are protected by the Due Process Clause of the 14th Amendment, the party seeking termination of parental rights must prove by clear and convincing evidence that termination is appropriate. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In *Santosky*, the Supreme Court wrote:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Id.* at 753–754, 102 S.Ct. 1388. *See also Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (cautioning against the use of presumptions in parental

rights cases); *see generally*, Steven Fleischer, Note, *Termination of Parental Rights: An Additional Sentence for Incarcerated Parents*, 29 Seton Hall L.Rev. 312 (1998).

9. Section 311(2) was reenacted as § 2511(a)(2) in the Adoption Act of 1980.

10. Other states have taken varying approaches to deal with the effect of a parent's incarceration in a termination of parental rights case. Some state statutes simply list incarceration as a relevant factor. *See* Ala. Code § 12–15–319(4); Ga.Code Ann. § 15–11–94(b)(4)(B)(iii); Kan. Stat. Ann. § 38–2269(b)(5); Okla. Stat. Ann. tit. 10A, § 1–4–904(B)(12); Or.Rev.Stat. § 419.504(B)(6). Other states provide that a lengthy period of incarceration can be a sufficient reason to terminate parental rights. *See* Ariz.Rev.Stat. Ann. § 8–533(B)(4); Ark.Code Ann. § 9–27–341(b)(3)(B)(viii); Idaho Code Ann. § 16–2005(1)(e); Iowa Code Ann. § 600A.8(9); R.I. Gen. Laws 15–7–7(2)(i); Tenn.Code Ann. 36–1–113(g)(6); Tex. Family Code Ann. § 161.001(1)(Q); Wyo. Stat. Ann. 14–2–309(a)(iv). Montana provides that no service plan is necessary where the parent will be incarcerated for more than one year. Mont. Code Ann. 41–3–609(4)(c).

tion, or conspiracy to murder or assault one of his or her own children. 23 Pa. C.S.A. § 2511(a)(9)(i)-(iii). Grounds for termination also exist where the parent has committed an equivalent offense in another jurisdiction. 23 Pa.C.S.A. § 2511(a)(9)(iv). Absent a conviction of one of these specified crimes, we are left to reconcile the § 2511(a)(2) factors with the proposition that incarceration, alone, cannot serve as the basis for terminating a parent's rights.[11]

The difficulty of this reconciliation is evident from the fact-intensive analysis set forth in our case law dealing with terminating the parental rights of an incarcerated parent. In *Bartasavich v. Mitchell,* 324 Pa.Super. 270, 471 A.2d 833, 834 (1984), the father killed the child's mother during a domestic dispute and then stabbed himself. The father eventually received five to 10 years of incarceration for voluntary manslaughter. *Id.* We reversed the trial court's order terminating the father's parental rights pursuant to 311(2)[12] of the 1970 Act, noting that the father's murder of the mother was a single act rather than a repeated course of conduct, and that the father had been paroled and was making efforts to maintain a relationship with the daughter. *Id.* at 836–37. In support of the holding we wrote as follows: "We note most emphatically that it is not [the father's] burden to show his capability, but rather, it is the burden of the petitioner who seeks the termination of his parental rights to show his incapacity." *Id.* at 836.

More recently, in *In re I.G.,* 939 A.2d 950 (Pa.Super.2007), this Court concluded that termination of an incarcerated father's parental rights was not warranted

---

**11.** In 1998, our legislature amended the Juvenile Act, 42 Pa.C.S.A. §§ 6301–57, to conform to requirements of the federal Adoption and Safe Families Act, 42 U.S.C. §§ 671, *et seq.* ("ASFA"). When reasonable efforts to reunite a foster child with biological parents have failed, the child welfare Agency must work toward terminating parental rights and placing the child with adoptive parents. This Court has noted that under the ASFA protocol, the process of reunification or adoption should be completed within eighteen (18) months. *In re N.W.,* 859 A.2d 501, 508 (Pa.Super.2004). However, "a placement goal change to adoption [under § 6351(f) of the Juvenile Act] does not terminate the parent's rights; however, it is a step in that direction." *In re A.L.D.,* 797 A.2d at 339. The next step in the direction of termination is the filing of a Petition for Termination of Parental Rights which is controlled by the Adoption Act, at issue in this case, and not the Juvenile Act. The focus in change of goal to adoption proceedings is the needs and welfare of the child and it is the needs and welfare of the child that is the reason for the eighteen (18) month timeframe for reunification or adoption. The timeframe "... is based on the policy that 'a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.' " *In re Adoption of R.J.S.,* 901 A.2d at 507 (internal citations omitted).

In cases involving termination proceedings under the Adoption Act, this Court has frequently cited to the eighteen (18) month timeframe for reunification or adoption as contemplated by the ASFA. *See e.g., R.J.S.,* 901 A.2d at 507; *In re Adoption of C.L.G.,* 956 A.2d 999, 1005 (Pa.Super.2008) (*en banc* ). The timeframe is relevant under the Adoption Act because in addition to finding by clear and convincing evidence that one of the statutory grounds for termination under § 2511(a) exists, there must also be a finding under § 2511(b) that termination of the parent's rights is in the best interest of the child. Our legislature's enactment of the amendments to the Juvenile Act expresses the public policy that permanency for the child within the eighteen (18) month timeframe is in the best interest of the child. We note again, however, that the Adoption Act has not been amended to provide that any specific time period of incapacity is *per se* grounds for termination of parental rights under § 2511(a).

**12.** The trial court proceedings in *Bartasavich* took place prior to the enactment of the Adoption Act of 1980, when § 311(2) became § 2511(a)(2).

under § 2511(a)(2). In that case, the father agreed to place his two children with their maternal grandparents, and when the maternal grandparents were no longer able to care for the children, the father sought kinship care for them. *Id.* at 951–52. Subsequently, the father was incarcerated in Montgomery County and Philadelphia County for various offenses, including drug and firearm offenses. *Id.* at 952. We recognized that parental duties are not tolled while the parent is incarcerated, and that a parent must use any resources available while in prison to maintain a relationship with his children. *Id.* at 954. Nonetheless, "[w]e cannot simply assume that [the parent's] current incapacity cannot or will not be remedied." *Id.* at 954.

In *I.G.*, Father made weekly telephone calls to the children while incarcerated, as per a family service plan created by the local agency. *Id.* at 953–54. The father did not, however, provide the agency with documentation that he took anger management and parenting classes. *Id.* at 954. We concluded that the agency failed to carry its burden because, among other things:

> Father has, through requests for visits, letters, and weekly phone calls, made a sincere effort to maintain a place of importance in his children's lives; and [...] there is no clear indication in the record of the remaining jail time Father faces, if any at this point.

*Id.*

In other cases, we have terminated parental rights pursuant to § 2511(a)(2) when the parent is serving an especially lengthy sentence. In *In re M.J.H.*, 348 Pa.Super. 65, 501 A.2d 648, 656 (1985), *appeal denied,* 514 Pa. 636, 522 A.2d 1105 (1987), we noted that § 2511(a)(2) "requires us to examine, not the *fact* of a parent's incarceration, but its *effects* on the child." (emphasis in original). The father in *M.J.H.* murdered the child's mother and received a sentence of life imprisonment. *Id.* We concluded that the father's criminal act essentially left the child with no parents, inasmuch as the mother was deceased and father's incarceration left him permanently unable to provide for the child's needs. *Id.* Accordingly, we concluded that termination of the father's parental rights was appropriate pursuant to § 2511(a)(2) inasmuch as life imprisonment is a form of incapacitation that cannot be remedied. *Id.*[13] *See also In re C.A.W. and A.A.W.,* 453 Pa.Super. 277, 683 A.2d 911 (1996) (affirming termination of parental rights where father was serving a prison term of 32 to 72 years for kidnapping and rape and had failed to demonstrate a commitment to the children even during periods when he was not incarcerated), *appeal denied,* 548 Pa. 631, 694 A.2d 619 (1996); *In re V.E. and J.E.,* 417 Pa.Super. 68, 611 A.2d 1267 (1992) (affirming the termination of a father's rights under § 2511(a)(2) where the father was serving a 12 to 25 year sentence and made no effort to use the resources available to him in prison).

This Court has also determined that repeated incarcerations can form the basis for termination under § 2511(a)(2), even where those incarcerations do not result in especially lengthy sentences. In *In re E.A.P.,* 944 A.2d 79 (Pa.Super.2008), we affirmed the termination of the mother's parental rights pursuant to § 2511(a)(2)

---

**13.** The *M.J.H.* Court distinguished *Bartasavich* because the father in *Bartasavich* received only a five to 10 year sentence, as compared to life imprisonment, and the father was paroled as of the time of argument. *M.J.H.,* 501 A.2d at 655. Likewise, *M.J.H.* distinguished *Jones Appeal* in that the mother's crime in *Jones,* the rape of her child, did not result in the death of the other parent and her sentence was of "short duration." *Id.* at 655.

where the mother was incarcerated four times over the first ten years of the child's life. We noted in *E.A.P.* that consistent with *McCray*, an incarcerated parent is expected to "utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children." *Id.* at 83. We observed that "[§ 2511(a)(2) ] does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for 'essential parental care, control, or subsistence necessary for his physical or mental well-being.' " *Id.* at 82 (quoting § 2511(a)(2)). We further stated:

[T]he language in [§ 2511(a)(2) ] should not be read to compel courts to ignore a child's need for stable home and *strong, continuous parental ties*, which the policy of restraint in state intervention is intended to protect. This is particularly so where 'disruption of the family has already occurred and there is no reasonable prospect for reuniting it[.]'

*Id.* (emphasis in original) (quoting *In re William L.*, 477 Pa. 322, 348, 383 A.2d 1228, 1241 (1978)).

The mother in *E.A.P.* completed parenting classes and two of seven phases of sex offender treatment. *Id.* at 83. On the other hand, the child had special needs and needed a caregiver who could be present. *Id.* The record revealed that the mother failed to care for the child even during the time periods when she was not incarcerated. *Id.* In addition, the mother's sex offender status would preclude her from having contact with the child for a period of time even if mother was released on parole. *Id.* We concluded that the trial court did not err in terminating the mother's parental rights, reasoning as follows:

Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2), that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to do in prison. *We acknowledge Mother's argument that she is doing everything that she is supposed to be doing. Under different facts, this might be determinative or given greater weight.* Here, however, Mother has been in prison for most of the child's life. There is no relationship to speak of, and in fact the record supports the court's finding that the child does not even know Mother. Obviously this is due to the length and frequency of Mother's incarcerations, and more recently, her sex offender status. Mother's participation in prison programs has not altered that fact.

*Id.* at 84 (emphasis added).[14]

Similarly, in *Z.P.*, this Court reversed the trial court and directed the trial court to enter an order terminating an incarcerated father's parental rights where the father had been repeatedly incarcerated. We noted that the father had been doing as much as he could do to meet the agency's family service plan from prison, including participation in various programs. *Z.P.*, 994 A.2d at 1122. The father did not

---

14. As we discuss *infra*, the mother's repeated failures to parent while not incarcerated, combined with her repeated incarcerations, drug abuse, and sex offender status, create a critical distinction between *E.A.P.* and the instant case. We are cognizant that Father's incarceration has severely restricted his ability to form a relationship with S.P. Nonetheless, if the absence of a normal parent-child relationship during the first few years of a child's life is to be dispositive in a termination of parental rights proceeding, then any parent of an infant or toddler who receives a term of incarceration of several years or more will have little or no chance of retaining parental rights.

have a record of misconduct while in prison. *Id.* at 1113. On the other hand, the father had no employment prospects upon his parole, and had a long history of drug and alcohol abuse that led to several psychotic episodes. *Id.* at 1122. The father had failed to parent several other children, even during the times he was not incarcerated. *Id.* at 1125. Moreover, the father made no effort to provide financial support while he was in prison, despite his receipt of social security disability payments. *Id.* at 1124. This Court concluded that, "while Father has been somewhat proactive during his incarceration, competent evidence of record supports [the Agency's] concerns Father would not be able to maintain his sobriety or properly care for [the child] upon release." *Id.* at 1125. Thus, termination of the father's rights was appropriate under § 2511(a)(2). *Id.* at 1126.

This case presents us again with a difficult question. We are mindful of the circumstances leading to Father's incarceration, and we are cognizant of S.P.'s special needs and her need for a permanent and stable home life. *See In Re Adoption of C.L.G.,* 956 A.2d 999, 1007 (Pa.Super.2008) (*en banc*) (noting that this Court will not toll a child's need for permanency indefinitely).[15] Nonetheless, our standard of review requires us to determine whether the evidence before the trial court was so clear, direct and weighty as to meet the substantial burden of clear and convincing evidence required of CYS to prevail in terminating Father's parental rights.

We also recognize that S.P. went through a goal change to adoption proceeding that was affirmed by this Court. But we must conduct our review in light of the legal distinctions between and the different consequences of goal change proceedings under the Juvenile Act and termination of parental rights proceedings under the Adoption Act.

█ This Court's memorandum affirming S.P.'s goal change from reunification to adoption under the Juvenile Act correctly focused on the needs and welfare of S.P. "In a goal change proceeding, the best interests of the child, and *not the interests of the parent,* must guide the trial court, and the parent's rights are secondary. The burden is on the Agency to prove the change of goal would be in the child's best interest." *In the Interest of D.P., D.M., A.M.,* 972 A.2d 1221, 1227 (Pa.Super.2009), *appeal denied,* 601 Pa. 703, 973 A.2d 1007 (2009) (citations omitted) (emphasis added); *see In re S.P.,* 986 A.2d 1292 (unpublished memorandum) at 6. This Court, in its goal change affirmance, likewise specifically noted that Father's efforts are not the central factor at a

**15.** In *C.L.G.,* this Court, in a 5–4 decision, affirmed an order terminating an incarcerated mother's parental rights pursuant to § 2511(a)(8). We observe that *C.L.G.* does not directly control the instant matter. First, the analysis to be conducted pursuant to § 2511(a)(8) differs from that of § 2511(a)(2). Under § 2511(a)(8), the needs and welfare of the child are an integral part of the determination as to whether grounds for termination exist. *See C.L.G.,* 956 A.2d at 1005–06, 1008. In contrast, under a termination predicated on § 2511(a)(2), the court must first focus on the parent to determine whether grounds for termination have been established. Only if this first burden is met with clear and convincing evidence does the court move to an analysis of the needs and welfare of the child under § 2511(b). Second, § 2511(a)(8) only requires that the conditions leading to the child's dependency continue to exist whereas under § 2511(a)(2) the Agency must establish with clear and convincing evidence that the parent cannot or will not remedy the situation. *Id.* at 1007. Finally, in *C.L.G.,* Mother's drug issues were the reason for the removal of child from her care and were also the reason for her incarceration. *Id.* at 1007. Here, the reason for Father's incarceration was not the reason for the child's placement into foster care.

change of goal hearing emphasizing again that the focus at such hearing is on the well-being of the child. *In re S.P.*, 986 A.2d 1292 (unpublished memorandum) at 10–11.

In contrast, the matter before us involves the termination of Father's parental rights under the Adoption Act and specifically under § 2511(a)(2). We emphasize that it is well established that under § 2511 of the Adoption Act, the court must engage in a bifurcated process prior to termination of a parent's rights. *See In re D.W.*, 856 A.2d 1231, 1234 (Pa.Super.2004). Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). *In re B.L.L.*, 787 A.2d 1007, 1013–14 (Pa.Super.2001). Only after determining that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interest of the child. *In re C.M.S.*, 884 A.2d 1284, 1286–87 (Pa.Super.2005); *A.C.H.*, 803 A.2d at 229; *B.L.L.*, 787 A.2d at 1013–14. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. *R.J.S.*, 901 A.2d at 508 (relied upon in *C.L.G.*, 956 A.2d at 1004).

Thus, our first focus is on Father's conduct and his efforts to rehabilitate himself and to maintain contact with S.P. during his incarceration, all of which are fully developed in the record.

Father was 19 years old and already incarcerated as a result of a third degree murder charge when the child was born. We are mindful that Father's ultimate conviction was of a crime requiring a showing of malice. However, the prosecuting attorney testified that Father's crime was one of extreme recklessness, not intent. Between the date of the child's birth in May 2005 until Father was transferred to a state correctional facility in February 2006, Father had six visits with S.P. Father did not have continued visits with S.P. because the trial court denied his request for visitation. Father did not complacently accept this determination. Instead, he attempted to file an appeal which was dismissed for failure to file a timely 1925(b) statement. Although we cannot determine from the record whether Father's appeal was counseled, nonetheless Father's attempt to reverse the order barring visitation evinces his "reasonable firmness in declining to yield to obstacles" put before him. *McCray*, 460 Pa. at 216, 331 A.2d at 655.

Even though Father could not have in person contact with S.P., he made birthday cards for her and sent her presents, letters and handmade drawings. S.P. reciprocated with artwork and a page with her handprint on it. The record reflects that Father did as much as he could possibly have done from prison, despite the lack of intervention or a family service plan from the Agency.[16] Beatty acknowledged that a

---

16. We recognize that we are not to re-evaluate the adequacy of the Agency's services subsequent to the completion of a proceeding changing the goal to adoption. *In re S.E.G.*, 587 Pa. 568, 583, 901 A.2d 1017, 1026–27 (2006). In this Court's unpublished memorandum affirming S.P.'s goal change to adop- tion, we concluded that the Agency carried its burden to prove that adoption was in the child's best interests under the Juvenile Act, 42 Pa.C.S.A. §§ 6301, *et. seq.*, and the federal Adoption and Safe Families Act, 42 U.S.C.A. §§ 671, *et. seq. In re S.P.*, 986 A.2d 1292 (unpublished memorandum) at 6–14. We are

bond between Father and S.P. might have been built but for the court orders precluding contact visits. Those court orders came about as a result of the trial court's policy against allowing children to visit correctional facilities. N.T., 12/5/08, at 77–78. This Court cannot weigh the limited contact between Father and S.P. against Father where the limitations on contact have been imposed on him despite his efforts. *I.G.*, 939 A.2d at 954; *see also In re M.T.T.*, 467 Pa. 88, 97, 354 A.2d 564, 568–69 (1976) (reversing termination of a father's parental rights under former § 311(1) where the agency frustrated father's attempts to have any contact with the child).

We observe also that the incident leading to Father's incarceration was not directly related to events that led to S.P.'s placement in foster care. *Cf. Z.P.*, 994 A.2d at 1120 ("The cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were part of the original reasons for the removal of the child."). In *C.L.G.*, for example, the mother was incarcerated on drug related charges, and her drug dependency issues were a reason for the child's placement. *C.L.G.*, 956 A.2d at 1006–07. Moreover, the mother was not incarcerated at the time of the child's birth, and therefore her incarceration was

not the "genesis" of her incapacity to parent the child. *Id.* at 1007.

With regard to the first prong of the § 2511(a)(2) analysis—the parent's repeated incapacity, neglect or refusal to discharge parental duties—the record reveals that Beatty, the Agency's caseworker, acknowledged that Father put forth a substantial amount of effort into establishing a relationship with S.P. and did everything he could have done from prison, and, given the opportunity, she believed he would be capable of parenting S.P.[17] Father's inability to develop more of a bond with S.P. than he did while incarcerated is attributable to limited opportunities for visitation. Father's voluntary enrollment in parenting and anger management classes and vocational training evidences an effort on his part to utilize all resources available to him. Thus, the record does not reflect that Father is neglecting or refusing to do all that he can do from prison. His incarceration leaves him incapacitated to perform many parental functions, but incarceration alone is not a sufficient reason to terminate parental rights.

We recognize that the mother in *E.A.P.* was, like Father, doing as much as she could have done from prison. *E.A.P.*, 944 A.2d at 84. The record in that case, however, established that the mother had been incarcerated on four separate occasions

not re-evaluating the Agency's services. Father's initiative in taking parenting classes, anger management, and vocational training without being assisted, asked or ordered to do so is a significant factor to be considered in determining whether the record reflects clear and convincing evidence in support of termination of his parental rights pursuant to § 2511(a)(2). The result we reached in the goal change appeal does not relieve us of the obligation to adhere to the principle that incarceration alone is not a sufficient basis for termination of parental rights.

**17.** As noted, Beatty's testimony was given on December 5, 2008 at the goal change proceeding. N.T., 12/5/08, at 36. Four months later, at the March 25, 2009 termination proceeding, Beatty testified that Father would be incapable of parenting. N.T., 3/25/09, at 128, 151. Beatty gave no explanation for the about face on that issue. The trial court relied on Beatty's later testimony, apparently ignoring the former. This flatly contradictory testimony from one CYS witness seriously undermines CYS' ability to carry its burden of proving by clear and convincing evidence that termination of Father's parental rights is appropriate.

during the child's life, that she did not take responsibility for the child even when she was out of prison, and that her sex offender status would preclude any relationship with the child for the foreseeable future. *Id.* at 83–84. Over a period of ten years, the mother had failed to establish any relationship with the child. *Id.* The mother's repeated failures and repeated incarcerations over the course of a decade distinguish *E.A.P.* from the instant matter.

The facts of this case are also distinguishable from those of *Z.P.*, in that Father, unlike the father in *Z.P.*, does not have a history of drug and alcohol abuse and psychotic episodes, and does not have a history of failing to parent other children. *See Z.P.*, 994 A.2d at 1122, 1125. Furthermore, Father has undergone vocational training to enable him to obtain employment upon his release, whereas the father in *Z.P.* had no specific plan for how he might support himself and a child upon his release. *See id.* at 1123.

The instant facts are more akin to those of *I.G.*, in that Father has made efforts to maintain contact with S.P., and the record is not clear as to how much prison time, if any, Father has yet to face. As we noted above, Father was eligible for parole as early as August of 2009, six months after the termination hearing took place. The uncontroverted evidence was that prisoners convicted of third degree murder generally serve 65–70% of their maximum sentence.[18] The record, as described above, reveals that Father has a clean record

while in prison and that the sentence he received was in the mitigated guideline range. These facts, combined with Father's vocational training in an effort to make himself employable upon release, do not support a conclusion that the inherent limitations on Father's ability to parent S.P. from prison cannot or will not be remedied.[19]

The learned trial court recognizes the settled law that incarceration alone cannot serve as the basis for the termination of a parent's right to his child. Trial Court Opinion, 6/24/09 at 5. But the trial court does not point to any action or inaction by Father establishing refusal or neglect, other than his incarceration. His efforts at establishing a relationship with S.P. are uncontroverted. His completion of self-initiated parenting and vocational training programs are likewise uncontroverted. As to both factors, CYS confirms Father's testimony.

As discussed, an analysis under § 2511(a)(2) of the Adoption Act is a two part analysis. First, it must be determined that grounds for termination under § 2511(a)(2) have been established by clear and convincing evidence. For the reasons stated, the record before us simply does not provide evidence that is so clear, direct and weighty, as needed under the clear and convincing evidence standard, to support the termination of Father's parental rights.

---

**18.** We cannot simply assume that Father will serve a longer portion of his sentence, even though the record does not foreclose that possibility. To do so would ignore the fact that CYS bears the burden of proving that Father's incapacity cannot or will not be remedied.

**19.** We are cognizant that the father in *I.G.* made pre-incarceration efforts to arrange suitable housing. *I.G.* 939 A.2d at 954. In

the instant matter, however, Father had no chance to demonstrate his ability to parent prior to his incarceration, owing to the timing of his incarceration and S.P.'s birth.

In addition, the record reflects that CYS did not create a family service plan for Father, based on the length of his incarceration. N.T., 3/25/09, at 131–32. Thus, Father was given no opportunity to take an active role with CYS.

*Only if* the grounds for termination have been established under § 2511(a)(2) does a court reach the needs and welfare of the child considerations embodied in § 2511(b). *See R.J.S.*, 901 A.2d at 508; *C.L.G.*, 956 A.2d at 1004. The trial court focuses on the second prong to the exclusion of the first. As the Adoption Act currently exists, we do not engage in a needs and welfare analysis under § 2511(a)(2) *unless* grounds for termination of a parent's rights have been established by clear and convincing evidence of the parent's action or inaction. Where, as here, pursuant to that standard, the evidence does not establish that Father has refused or neglected to undertake parental responsibilities to the extent possible while incarcerated, grounds for termination of his parental rights do not exist. The Pennsylvania Legislature may have the ability to establish that some specified period of incarceration, without more, is grounds for termination of a parent's rights. To date, the legislature has not done so. We are thus bound by 40 years of unbroken precedent from the Supreme Court and this Court.

The agency's failure to carry its burden under the first prong of the § 2511(a)(2) analysis requires reversal of the decree terminating Father's parental rights. For the reasons stated, the record does not contain clear and convincing evidence that Father has refused or neglected to undertake his parental responsibilities to the extent possible while incarcerated, nor does the record support a conclusion that Father's incapacity cannot or will not be remedied. Accordingly, we vacate the decree terminating Father's parental rights.

Decree vacated. Jurisdiction relinquished.

ALLEN, J. files a Dissenting Opinion in which STEVENS, P.J., FORD ELLIOTT, P.J.E. and GANTMAN, J. join.

## DISSENTING OPINION BY ALLEN, J.:

I respectfully dissent. The Majority concludes that under 23 Pa.C.S.A. § 2511(a)(2), Washington County Children & Youth Social Services ("CYS") failed to carry its burden of proof with respect to terminating the parental rights of G.P. ("Father") to S.P. ("Child"). In conducting its analysis under 23 Pa.C.S.A. § 2511(a)(2), the Majority states that "our first focus is on Father's conduct and his efforts to rehabilitate himself and to maintain contact with [Child] during his incarceration[.]" Op. at 736. Applying this test, which is unfounded in and contrary to existing case law, the Majority finds that the trial court abused its discretion in terminating Father's parental rights. The Majority bases its decision exclusively on the fact that while imprisoned, Father sent Child some presents and cards, took vocational training, and appealed an order denying a contact visit. *See* Op. at 736–37. The Majority, in contrast to the trial court, places significant weight on these facts, and in so doing, fails to pay the appropriate deference to the trial court's credibility and weight determinations pursuant to our standard of review.

In my view, the Majority erroneously creates a test for purposes of 23 Pa.C.S.A. § 2511(a)(2) that focuses entirely on the parent's attempts to maintain contact and communication with the child. I believe that the Majority's holding directly contravenes *In re Z.P.*, 994 A.2d 1108 (Pa.Super.2010). In that case, a panel of this Court correctly held that when conducting an analysis under 23 Pa.C.S.A. § 2511(a)(2), it is error for a court to consider an incarcerated parent's efforts at "parenting" as the exclusive factor in deciding whether to terminate parental rights. *In re Z.P.*, 994 at 1126 ("The trial

court erred when it held Father's efforts were the only determinative factors at issue."). Pursuant to the Majority's opinion, an incarcerated parent's efforts are the sole, dispositive factor. That is, as long as the parent tries to make contact with the child while in prison, that parent's parental rights are preserved and the child may remain in foster care. I am unable to subscribe to the Majority's reasoning. Rather, under well-settled Pennsylvania law, "[i]f ... the parents' incapacity cannot be remedied, then, even though the parents demonstrate their love for the children and make sincere efforts to perform parental duties, their parental rights may be terminated." *In re M.J.H.*, 348 Pa.Super. 65, 501 A.2d 648, 656 (1985).

Unlike the Majority, I conclude that the record contains the clear and convincing evidence necessary to terminate Father's parental rights. Father, who was incarcerated prior to Child's birth in May of 2005, never had a meaningful relationship with Child, and has no reasonable prospect of becoming a suitable parent for Child. The trial court found these facts credible, and placed substantial weight on them in reaching its decision to terminate Father's parental rights. Under *In re Z.P.* and *In re E.A.P.*, 944 A.2d 79, 84 (Pa.Super.2008), these facts are enough to support termination. Hence, paying the appropriate deference to the trial court's credibility and weight determinations, I conclude that the trial court did not abuse its discretion in terminating Father's parental rights.

Our standard of review from an order terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005) (citation omitted).

Further,

[This Court is] bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004) (citation omitted). "If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result." *In re Z.P.*, 994 A.2d at 1116.

Indeed, the fact of imprisonment alone does not provide sufficient grounds for the termination of parental rights. *In re Adoption of K.J.*, 936 A.2d 1128 (Pa.Super.2007). However, an incarcerated parent's responsibilities are not tolled during his incarceration. *In re G.P.–R.*, 851 A.2d 967 (Pa.Super.2004). Each termination of parental rights case involving an incarcerated parent must be analyzed on its own facts, keeping in mind that the child's need

for consistent parental care and stability "cannot be put aside or put on hold simply because the parent is doing what he is supposed to do in prison." *In re E.A.P.,* 944 A.2d at 84.

To terminate parental rights under 23 Pa.C.S.A. § 2511(a)(2), the petitioner must prove: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley,* 719 A.2d 327, 330 (Pa.Super.1998); *see* 23 Pa.C.S.A. § 2511(a)(2).

The grounds for termination of parental rights under 23 Pa.C.S.A. § 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.,* 797 A.2d 326, 337 (Pa.Super.2002).

> [23 Pa.C.S.A. § 2511(a)(2) ] does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re E.A.P.,* 944 A.2d at 82 (internal citations and quotation marks omitted) (emphasis added).

"[23 Pa.C.S.A. § 2511(a)(2) ], focusing as it does on the needs of the child, requires us to examine, not the *fact* of a parent's incarceration, but its *effects* on the child." *In re M.J.H.,* 501 A.2d at 656 (emphasis in original). "Under Section 2511(a)(2), the parents' interests in the continued relationship with their children are protected by the requirement that their parental rights may not be terminated unless it is proved that their incapacity 'cannot or will not be remedied.'" *Id.* at 654 (citations omitted). "If ... the parents' incapacity cannot be remedied, then, even though the parents demonstrate their love for the children and make sincere efforts to perform parental duties, their parental rights may be terminated." *Id.*[1]

Here, the record conclusively established that Father never had a meaningful relationship with Child or will likely gain the capacity to provide for her well-being within a reasonable time. When Child was born on May 7, 2005, Father was 19 years old and incarcerated, serving a five to ten year sentence after pleading guilty to third-degree murder. Prior to his incarceration, Father was adjudicated delinquent for committing burglary and was placed on juvenile probation. At the time of his incarceration, Father was unemployed and did not have his own housing or transportation.

During the first eight months of her life, Child saw Father in prison a total of six times. This is the extent to which Child and Father have been in each other's

---

1. "Once the statutory requirement for involuntary termination of parental rights has been established under [23 Pa.C.S.A. § 2511(a) ], the court must consider whether the child's needs and welfare will be met by termination pursuant to [23 Pa.C.S.A. § 2511(b) ]. In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.,* 994 A.2d at 1121.

physical presence. Quite simply, Child does not know Father, even though Father occasionally sent Child cards and presents.

On December 19, 2005, Child was adjudicated dependent because B.D., Child's biological mother ("Mother"), tested positive for THC and was involved in a domestic dispute. Child and Mother were placed in foster care together. On September 9, 2008, Mother voluntarily relinquished her parental rights to Child and Child's half-sister, N.D. Because Father was imprisoned throughout this time, Child remained in foster care. Father thus lacked the capacity and ability to parent Child from the inception of this case. In December 2008, CYS filed a petition recommending that Child's goal be changed to adoption. On December 12, 2008, the trial court granted CYS' petition. This Court affirmed in an unpublished memorandum. *In re S.P.*, 986 A.2d 1292 (Pa.Super.2009) (unpublished memorandum).

Father was eligible for parole at the completion of his minimum sentence in August 2009. At the termination hearing, it was at best speculative whether Father would in fact be paroled. It was possible that Father would not be released from prison until the expiration of his sentence in August 2014.

Assuming that Father's parole was and/or is imminent, his ability to assume custody of Child is questionable. Child has developmental delays and is possibly autistic, which would require a great deal of therapy and medical attention. The foster mother testified that Child requires permanency and a caregiver who can provide almost constant attention due to Child's special needs. Father conceded that even if he was released early, he would have to enter a halfway house, obtain housing and employment, and fulfill the conditions of his parole. Father admitted that upon his release, he could not provide a specific time-frame in which he would gain the capacity to care for Child.

At the date of the hearing, Child was in foster care for over three years.

In remarkably similar circumstances, this Court found the termination of parental rights proper.

In *In re Z.P.*, the father was incarcerated from September 2007, prior to his child's birth, until June 2009. The father never visited with the child while he was incarcerated because visits were not available. The father, however, requested monthly updates on the child. The father also sent the child a birthday card and pictures of himself. While incarcerated, the father participated in various programs, including parenting classes. In June 2009, the father was transferred to a pre-release program, and requested a visit with the child. The father had a history of drug and alcohol abuse, and was imprisoned on at least two other occasions for drug-related offenses. Although the father received social security benefits, he did not contribute any money to the child's support.

On appeal, a panel of this Court found the evidence sufficient to terminate the father's parental rights. Particularly, this Court found that the father was not capable of meeting the essential needs of the child and would be unable to do so within a reasonable time. This was due primarily to the fact that at the time of the hearing, the father was in a pre-release program, had not been paroled, and could potentially face incarceration until 2018. In addition, this Court stated that even if the father's parole was imminent, his ability to assume custody of the child "was speculative at best." 994 A.2d at 1123–24. Notably, the father's "future with respect to adequate housing and employment was completely indefinite," and the father did not make

any arrangements for the child to receive some of his social security benefits. *Id.* at 1124. The father was also unable to produce a viable kinship option to take care of the child during his transition, and he had a history of drug abuse and drug related offenses. Conceding that during his incarceration father was "proactive" in his attempts to establish contact with the child, this Court remained unconvinced that the father could properly care for the child upon his release. *Id.* at 1125. In sum, this Court analyzed the facts of the case vis-a-vis the Adoption and Safe Families Act ("ASFA"), and concluded:

> [The child], therefore, would have to remain in foster care until some speculative point in the future before Father could care for him. **Pennsylvania law does not compel this result just because an incarcerated parent participates in prison programs, shows interest in his child, participates in legal proceedings, and works toward early release from prison.** The complete circumstances of the case must be considered. [The child's] need for consistency and stability cannot be ignored, merely because Father is doing what he is supposed to do in prison. To the contrary, the ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. [The child] has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification. Father's overall parenting history revealed no genuine capacity to undertake his parental responsibilities, and the Agency's evidence was sufficient to terminate his parental rights under subsection (a)(2).

994 A.2d at 1125–26 (emphasis added).

In *In re E.A.P.*, the mother was convicted of crimes on four different occasions, and thus, she was incarcerated for most of the child's life. The child was ten years old at the time of the termination proceedings, and due to the mother's imprisonment, the mother spent a total of 17 months with the child. Significantly, the child suffered from various emotional disorders and in November 2006, the permanency goal was changed to adoption. At that time, the mother was serving a sentence for indecent assault. The mother's sentence began in 2004 and the maximum sentence was to expire in March 2009. In prison, the mother completed various programs, including a portion of her required sex offender treatment. A termination hearing was held in March 2007.

The trial court concluded that the evidence was sufficient to terminate the mother's parental rights. A panel of this Court affirmed on appeal. Our reasoning was as follows:

> Here, the record does show that Mother has participated in prison programs. Mother has completed 2 of 7 phases of the required sex offender treatment, and she has completed over 52 weeks of parenting programs, including one focusing on dealing with children with ADHD. This is commendable, but it cannot be the decisive factor under these circumstances.

> The caseworker, the therapist/psychiatric mental health specialist, and the child advocate each testified that E.A.P., in part due to her disorders, requires permanency and requires a caregiver who will be present for her. This was a recurring theme at the termination hearing. As the trial court stated, "the record in this case establishes that Mother does not have the capacity to parent [E.A.P.] because of her inability to remain present in [E.A.P.'s] life."

Essentially, Mother has never really provided parental care for E.A.P. Even when she was not incarcerated, E.A.P. lived with Grandmother. Though Mother resided at Grandmother's as well for part of that time, the remainder of that time was spent at the homes of friends and acquaintances while E.A.P. remained with Grandmother.

944 A.2d at 83.

Similar to *In re Z.P.*, the *In re E.A.P.* court discounted the mother's efforts at rehabilitation and the possibility that she may be paroled:

Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2), that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to do in prison. We acknowledge Mother's argument that she is doing everything that she is supposed to be doing. Under different facts, this might be determinative or given greater weight. **Here, however, Mother has been in prison for most of the child's life. There is no relationship to speak of, and in fact the record supports the court's finding that the child does not even know Mother.** Obviously this is due to the length and frequency of Mother's incarcerations, and more recently, her sex offender status. Mother's participation in prison programs has not altered that fact.

944 A.2d at 83–84 (emphasis added).

With respect to the mother's future ability to parent the child, the *In re E.A.P.* court stated:

... It is certainly possible that come March 2009 Mother will have completed her sex offender program and may be able to be a parent to E.A.P.; however, on this record we cannot view that possibility as a "reasonable prospect." In light of this, and despite Mother's compliance, the bottom line remains that E.A.P. has been without essential parental care for more than two years, in fact for most of her life. 23 Pa.C.S.A. § 2511(a)(2). On this record, we simply cannot take the risk that E.A.P., who is specifically adoptable at present, should linger in foster care in the hope that Mother can or will change her conduct of the past ten years.

944 A.2d at 83–85 (citations and footnotes omitted).

Accordingly, the *In re E.A.P.* court upheld termination of the mother's parental rights.

The facts of the present case conform with the holdings of *In re Z.P.* and *In re E.A.P.* Akin to *In re Z.P.* and *In re E.A.P.*, Father was incarcerated prior to Child's birth and has been incarcerated for Child's entire life. Father has had very limited contact with Child, namely six visits within a short period of time when Child was an infant. In *In re Z.P.*, the child could not visit the father in person, due in large part to inappropriate facilities. Here, Father was denied contact visits as a result of a court order, but similar to *In re Z.P.*, this was because the facility was an improper environment for an infant. Quite simply, Father has had minimal contact with Child, and like the parents in *In re Z.P.* and *In re E.A.P.*, Father has never assumed the status of caregiver.

While imprisoned, Father could have attempted to call Child. Father also could have petitioned for a contact visit at a later date, requested updates on Child, arranged for a non-contact visit, or otherwise taken a more active involvement with CYS. No one prevented Father from pursuing these actions. Yet the Majority finds that Father "did as much as he could possibly

have done from prison." Op. at 736. I simply cannot agree with the Majority's assessment of the evidence. The record demonstrated that Father knows very little about Child, including Child's mental health and social life. Contrary to the Majority's position, Father's lack of knowledge about Child's affairs and well-being is attributable primarily to Father's inactivity, as opposed to any restraints imposed upon him.

More importantly, the record established that Father was not capable of meeting the essential needs of Child and would be unable to do so within a reasonable time. Like the father in *In re Z.P.*, Father was incarcerated prior to Child's birth, and he may not be released from prison until the expiration of his sentence in August 2014. Even if Father's parole was imminent, the record demonstrated that Father's inability to care for Child would not likely be remedied. While Father does not have a criminal history as severe as the parents in *In re Z.P.* and *In re E.A.P*, Father, prior to his current incarceration, was adjudicated a delinquent child, had a juvenile record, and was on juvenile probation. At the time of his incarceration, Father was unemployed and did not have his own housing or transportation. Father admitted that even if he was released early, he could not provide a specific time-frame in which he would gain the capacity to care for Child. Notably, Father would have to enter a halfway house, obtain housing and employment, and fulfill the conditions of his parole while transitioning into society and taking care of Child.

Additionally, like the child in *In re E.A.P.*, Child has developmental problems. Child is possibly autistic, which would require significant therapy. The foster mother testified that Child requires permanency and a caregiver who, besides providing constant attention, would be able to transport Child to therapy at least six times a week. Significantly, Father is reluctant to accept the fact that Child has special needs. The trial court was concerned that "[e]ven if released, it is unlikely Father will be able to obtain housing, employment, transportation, fulfill his responsibilities on parole and provide the care [Child] needs, including transporting her to almost daily therapy appointments and caring for her special needs on a daily basis." Trial Court Opinion (T.C.O.), 6/24/09, at 9. The trial court's concern has ample support in the record. Accordingly, while there is a remote possibility that Father may be able to parent Child upon his release, this possibility is not a "reasonable prospect." *In re E.A.P.*, 944 A.2d at 85. By the time of the termination hearing, Child had been in foster care for over three years.

Therefore, the facts of this case fall squarely within the parameters of *In re Z.P.* and *In re E.A.P*, and the evidence of record was sufficient to terminate Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2). *See In re Z.P.*, 994 A.2d at 1126 ("[The child] has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification. Father's overall parenting history revealed no genuine capacity to undertake his parental responsibilities, and the Agency's evidence was sufficient to terminate his parental rights under subsection (a)(2)."); *In re E.A.P.*, 944 A.2d at 85 ("[T]he bottom line remains that E.A.P. has been without essential parental care for more than two years, in fact for most of her life. On this record, we simply cannot take the risk that E.A.P., who is specifically adoptable at present, should linger in foster care in the hope that Mother can or will change her

conduct ...").[2] Although it is possible that the evidence could support an opposite result, depending on the weight and credibility determinations of the fact finder, there was no abuse of discretion or error of law upon which to disturb the trial court's decision to terminate Father's parental rights. As illustrated above, the trial court did not terminate Father's parental rights based solely upon the fact that Father was incarcerated. Rather, the trial court appropriately weighed the individual circumstances of this case, focusing on the effect that Father's incarceration had on Child and the likelihood that Father's incapacity would be remedied in the near future. *See In re M.J.H.*, 501 A.2d at 654 and 656.

In light of the foregoing, I simply cannot risk that Child, who is adoptable at present, should linger in foster care with the improbable hope that Father will become a functional parent sometime in the future. *See In re E.A.P.*, 944 A.2d at 85. I find no abuse of discretion or error of law on the part of the trial court in terminating Father's parental rights.

While the circumstances of this case most closely resemble *In re Z.P.* and *In re E.A.P.*, the Majority attempts to distinguish *In re Z.P.* and *In re E.A.P.* by pointing out that when compared to Father, the parents in those cases had a more detailed criminal or drug and alcohol history. Op. at 737–38. These facts, however, merely contributed toward a finding in *In re Z.P.* and *In re E.A.P* that the respective parent's incapacity would not be remedied upon release. By no means are these facts, as the Majority suggests, a prerequisite to making such a finding. Rather, as explained above, the record adequately established that Father—even in the absence of a more checkered past—was not capable of meeting the essential needs of Child and would be unable to do so within a reasonable time. That is, Father's incapacity, like the parents in *In re Z.P.* and *In re E.A.P.*, will not likely be remedied. Consequently, I find that the Majority improperly distinguishes *In re Z.P.* and *In re E.A.P.* when Father's inability to parent Child is substantially the same as the parents in *In re Z.P.* and *In re E.A.P.*[3]

After discounting the instructive and persuasive value of *In re Z.P.* and *In re E.A.P.*, the Majority concludes: "Where ... the evidence does not establish that Father has refused or neglected to undertake parental responsibilities to the extent possible while incarcerated, grounds for termination of his parental rights do not exist." Op. at 739. According to the Majority, the sole focus under 23 Pa.C.S.A. § 2511(a)(2) lies in analyzing Father's efforts to establish contact with Child while in prison. Op. at 736 ("Thus, our first focus is on Father's conduct and his efforts to rehabilitate himself and to maintain contact with [Child] during his incarcera-

---

**2.** Due to the lack of a meaningful bond between Father and Child, I similarly conclude that CYS meet its burden of proof under 23 Pa.C.S.A. § 2511(b).

**3.** The Majority also distinguishes this case from our recent decision in *In Re Adoption of C.L.G.*, 956 A.2d 999 (Pa.Super.2008) (*en banc*), claiming that Father's incarceration was not directly related to events that led to Child's placement in foster care. Op. at 735 n. 15 and 737. In my view, *C.L.G.* supports a finding that CYS met its burden of proof, as Father's incarceration contributed to Child's placement in foster care. Indeed, Father's incarceration was part of the reason Child was adjudicated dependent and placed in foster care, because if Father was not incarcerated, he *may* have been available as Child's caretaker. However, Father was incarcerated, and thus could not assume care of Child after Mother voluntarily relinquished her parental rights to Child.

tion[.]"). I find that this precept of law directly contravenes our decision in *In re Z.P.*

In *In re Z.P.*, the trial court found that the evidence was insufficient to terminate the incarcerated father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) because the father requested monthly updates on the child, participated in various prison programs, and sent the child birthday cards and pictures. The trial court, like the Majority in this case, reasoned that "if a parent does everything in their power under the law to care for their child, parental rights must not be terminated. It is clear from [the father's] conduct since his incarceration that he has not evidenced a settled purpose of relinquishing his parental claim of [the child] nor has he refused or failed to perform parental duties." 994 A.2d at 1123. A panel of this Court disagreed. The *In re Z.P.* court expressly concluded that the trial court committed an error of law in focusing solely on the father's attempts to contact the child while in prison, and directly condemned the approach adopted by the Majority in this case. Specifically, the *In re Z.P.* court correctly concluded that "The trial court erred when it held Father's efforts were the only determinative factors at issue." 994 A.2d at 1126. This is because the focal point of the inquiry, for purposes of 23 Pa.C.S.A. § 2511(a)(2), is not on the incarcerated parent's efforts to contact the child, but rather, on whether the parent's incapacity is likely to be remedied, and the effect that the parent's incarceration has on the child. *See In re Z.P.*, 994 A.2d at 1126; *In re M.J.H.*, 501 A.2d at 654 and 656; *see also In re E.A.P.*, 944 A.2d at 82.

Although an incarcerated parent's efforts to maintain contact with the child has a central role in termination cases under 23 Pa.C.S.A. § 2511(a)(1), *see In re Adoption of Dale A., II*, 453 Pa.Super. 106, 683 A.2d 297, 302 (1996), it has never been a conclusive in this Court's case law for termination proceedings pursuant to 23 Pa. C.S.A. § 2511(a)(2).[4] The Majority erroneously engages in a 23 Pa.C.S.A. § 2511(a)(1) analysis when deciding a case under 23 Pa.C.S.A. § 2511(a)(2), even though the two statutory provisions are dissimilar. As a result, the Majority's analysis runs afoul of the plain language and spirit of 23 Pa.C.S.A. § 2511(a)(2). *See In re Z.P.*, 994 A.2d at 1117 ("Thus, while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)") (citing *In re M.J.H.* and *Matter of Adoption of C.A.W.*, 453 Pa.Super. 277, 683 A.2d 911, 916 (1996)); *In re E.A.P.*, 944 A.2d at 82 ("[23 Pa.C.S.A. § 2511(a)(2)] does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsis-

4. Under 23 Pa.C.S.A. § 2511(a)(1), grounds for termination exist where "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *Id.*

By way of contrast, under 23 Pa.C.S.A. § 2511(a)(2), grounds for termination exist where "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." *Id.*

As indicated by their plain language, the two statutory provisions are remarkably different. 23 Pa.C.S.A. § 2511(a)(1) pertains to parental abandonment, while 23 Pa.C.S.A. § 2511(a)(2) primarily involves incapacity that will not be remedied.

tence necessary for his physical or mental well-being."). The Majority's analysis also marks an extreme departure from our decisions in *In re M.J.H., In re E.A.P.* and *In re Z.P.* Ultimately, the Majority fashions a new legal test that is contrary to the long-standing jurisprudence of this Court.

The Majority also does not discuss the effect that Father's incarceration has on Child or the likelihood that Father's incapacity would be remedied in the near future. The Majority essentially disregards the trial court's findings, and focuses instead on the fact that Father sent Child cards and some presents, and that Child could not have a contact visit with Father. In contravention to the trial court and our standard of review, the Majority places significant weight on these facts in order to find that termination of parental rights was improper.

In my view, Father's gestures, standing alone, were insufficient to forge a meaningful relationship with Child. In any event, Father's gestures and Child's inability to have a contact visit with Father in prison were insufficient factors in *In re Z.P.* to sustain parental rights, and are likewise inadequate to preserve Father's parental rights with regard to Child. 944 A.2d at 1125 (concluding that a child should not be placed in foster care indefinitely "just because an incarcerated parent ... shows interest in the his child[.]"). Indeed, as in *In re E.A.P.*, the harsh reality is that Child does not even know who Father is, and "there is no relationship to speak of." 944 A.2d at 84. As the trial court found:

> In this case, Father has been incapable of performing his parental duties since Child's birth. Though [Father] has attempted to have visits with the Child and sent cards to her, Father has been unable to maintain a parental relationship, because one never existed. And it

was Father's own actions, for which he accepted responsibility in pleading guilty to third-degree murder, which prevented such a relationship from forming. . . .
Father has been incarcerated for Child's entire life, there is no relationship or bond to speak of, and there was testimony that Child does not know Father. . . .
[I]t is not likely that Father will be capable of providing the care and parenting that Child needs in a reasonable time. Father admitted there is no date certain when he can provide for her needs but thinks she should wait until he can. . . . [T]he child's need for permanence and stability will not be subordinated to a parent's claims of progress or hope for the future.

T.C.O., 6/24/09, at 6–7 and 8.

The trial court's findings and legal rationale is consistent with this Court's case law that the child's right and need for a stable and continuous home environment is the paramount concern in an inquiry under 23 Pa.C.S.A. § 2511(a)(2). *See In re E.A.P.*, 944 A.2d at 82 ("[T]he language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it."); *In re Z.P.*, 994 A.2d at 1126 (reiterating the principle that a child's right must prevail over a parent's, where parent cannot meet his minimal parental responsibilities).

Given the evidence of record that Father's incapacity will not likely be remedied in the near future, the trial court did not abuse its discretion in placing little to no weight on the fact that Father sent Child cards and some presents, and that Child could not have a contact visit with

Father in prison. "If ... the parents' incapacity cannot be remedied, then, even though the parents demonstrate their love for the children and make sincere efforts to perform parental duties, their parental rights may be terminated." *In re M.J.H.,* 501 A.2d at 654. The Majority, in essence, reweighs the evidence of record, highlighting the evidence that it finds most favorable to Father, and reaches its own conclusion as though it were sitting as the trial court in the first instance. This, however, is not the appropriate standard for appellate review. *See In the Interest of R.J.T.,* 608 Pa. 9, 9 A.3d 1179, 1190 (2010) ("This case epitomizes why appellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations.... Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. The Superior Court in this case did just that in highlighting negative information regarding Parents.... Accordingly, we conclude that the Superior Court erred in reevaluating the evidence."). The Majority finds that Father's efforts in sending Child cards and presents are entitled to great weight. The trial court did not.

To reach its conclusion, the Majority also presumes that Father will be capable of providing for Child, based upon the fact that Father took parenting classes, anger management and vocational training in prison. *See* Op. at 737–38 and 738. However, "Pennsylvania law does not compel [the preservation of parental rights] just because an incarcerated parent participates in prison programs." *In re Z.P.,* 994 A.2d at 1125. To the contrary, Child's need for consistency and stability cannot be ignored merely because Father is "doing what [he] is supposed to do in prison." *Id.* The ASFA-related policies demand

reasonable efforts within a reasonable time to remedy parental incapacity, and Child's need for permanency should not be suspended, where, as here, Child has been in foster care for over three years, and there is little rational prospect of timely reunification.

Finally, the Majority finds analogous support for its proposition in *In re I.G.,* 939 A.2d 950 (Pa.Super.2007). Op. at 732–33 and 738.

I conclude that *In re I.G.* is factually distinguishable because it involves an exemplary father who *prior* to incarceration, tried to place his abandoned children in a suitable living arrangement because he did not have the ability to provide for them. In *In re I.G.,* the father assumed custody of the children after the mother abandoned them. Realizing that his living arrangements were inadequate for him and the children, the father voluntarily placed the children with the maternal grandparents. After the maternal grandparents were no longer able to care for the children, the agency placed them in foster care, and father arranged for the children to be taken out of foster care and placed with paternal aunt and uncle. The father was then incarcerated.

A panel of this Court in *In re I.G.* reversed the termination of parental rights. We did so because the father "has tried to do the right thing and assume parental responsibility, first when Mother left the children, and then in acknowledging his overcrowded living conditions and signing a voluntary placement agreement, and finally in seeking out kinship care for the children." 939 A.2d at 954. Based upon these facts, and more importantly, the existence of an imprecise record, this Court was unwilling to assume that the father's current incapacity could not or would not be remedied.

Here, by contrast, Father was imprisoned before Child was born. Father never assumed custody or responsibility of Child prior to incarceration. Therefore, *In re I.G.* is factually inapposite.

More troubling, *In re I.G.* does not support the Majority's decision to preserve parental rights so long as a parent sends a few cards and presents to the child and registers for prison programs. Although in *In re I.G.* this Court referenced the fact that the father tried to maintain contact with the children in prison, we did so only to illustrate the necessity for a "searching inquiry" and a fully developed record. 939 A.2d at 954. In highlighting the lack of a fully developed record, this Court further noted, among three other factors, that the length of father's incarceration was not determined at the time of the parental termination hearings. As such, this Court did not know if father was incarcerated, would face incarceration, or if he was released from incarceration at the time of the termination hearing. *Id.* at 954–55 and n. 6. Primarily on this basis, the *In re I.G.* court was unwilling to assume that the father's incapacity would not be remedied.

In stark contrast to *In re I.G.*, the record in this case conclusively established that Father was imprisoned for a term of five to ten years and may not complete his sentence until August 2014. Moreover, unlike *In re I.G.*, there is sufficient evidence establishing that Father does not know Child, has never cared for Child, and that Father's incapacity will not likely be remedied in the near future.

Therefore, I believe that the Majority misreads *In re I.G.* Nothing in that decision can reasonably be construed to sustain the notion that a parent who has been imprisoned for a child's entire life can maintain parental rights simply by sending the child occasional cards and presents and enrolling in prison programs. In short, *In re I.G.* does not lend support to the Majority's reasoning or holding.

In sum, I find that the Majority's decision is an unwarranted extension of existing law, and I cannot join its opinion. Contrary to the Majority, I conclude that CYS adduced sufficient evidence to terminate Father's parental rights under 23 Pa. C.S.A. § 2511(a)(2), and I would affirm the trial court's order. Accordingly, I dissent.