J.S45045/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.I.N., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| APPEAL OF: L.N., A MOTHER | : | |
| | : | |
| | : | No. 796 EDA 2014 |

Appeal from the Decree Entered February 4, 2014
In the Court of Common Pleas of Philadelphia County
Family Court No(s).: CP-51-AP-0000026-2014
CP-51-DP-0000537-2012, FID: 51-FN-000988-2012

BEFORE: BOWES, ALLEN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:              **FILED AUGUST 29, 2014**

L.N. ("Mother") appeals from the decree entered in the Philadelphia County Court of Common Pleas involuntarily terminating her parental rights to her son, D.I.N. ("Child"), and changing Child's goal to adoption. We hold the court properly terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b) of the Adoption Act and affirm.

Child was born in February of 2011. The father of the child is D.W.[1] ("Father.") The trial court set forth the factual and procedural history as follows.

On March 22, 2012, DHS received a General Protective

---

[*] Former Justice specially assigned to the Superior Court.

[1] Father did not appear at the termination hearing, although his counsel did. Father is not a party to this appeal.

Services (GPS) report alleging that Child[, who was then thirteen months old,] had a small bruise on his forehead, and that [Mother] stated that Child had fallen and hit his head while at a friend's home on March 17, 2012. The report also alleged that Mother did not take Child to be examined by a doctor[, was] diagnosed as suffering from schizophrenia[,] stopped taking her medication when she became pregnant[,] did not take her medication after giving birth to Child[,] and stated that her doctor had recommended that she not take her medication. This report was substantiated.

DHS learned that Mother reside[d] in a dual diagnosis program at Rowan House through Project Home. On March 27, 2012, DHS visited Mother and Child at Rowan House. The staff stated to DHS that Child had unexplained injuries and Mother was at risk of losing her housing due to her non-compliance with house rules. DHS observed that Mother appeared to be incoherent and she was unable to answer questions. Mother admitted that she was not seeing a therapist and that she had not taken her medication for a year. During the visit, DHS also observed that Mother was not properly supervising Child and Child had a bruise and scratch on the left side of his forehead. Mother could not explain when or where the injuries had occurred. DHS learned that Mother stopped attending Health Start which offered support to her regarding proper care of Child. Mother refused to provide DHS with her family's information in order to identify an appropriate caregiver for Child. The police were called due to Mother's erratic behavior.

On March 27, 2012, DHS obtained an Order of Protective Custody (OPC) for Child and placed him at Baring House. The identity and whereabouts of Child's father were unknown to DHS at that time. At the shelter care hearing, held on March 29, 2012, the OPC was lifted and the temporary commitment to DHS was ordered to stand. The [c]ourt ordered that Mother be referred to the Behavioral Health System (BHS) for consultation.

On March 29, 2012, DHS placed Child in foster care through the Juvenile Justice Center (JJC). On April 5, 2012, the [c]ourt adjudicated Child dependent and fully

committed him to DHS. Mother was offered supervised visits at the agency twice per week. Mother was referred to BHS for outpatient services.

On July 3, 2012, the [c]ourt took notice that D.W. had been identified as Child's father. DHS learned that Mother had been visiting Child on a weekly basis; however, she did not seem to connect well with [Child] during the visits. It was noted that Mother had a tendency to yell at Child during the visits for no apparent reason.

On August 6, 2012, Mother and Father attended a hearing for Child. Mother was offered supervised visits at the agency twice weekly and Father was offered biweekly supervised visits at the agency. The [c]ourt took notice that Mother attended the Achieving Reunification Center (ARC). The [c]ourt ordered Mother to sign releases of mental health participation and ordered her to participate in a parenting capacity evaluation. . . . DHS was ordered to refer Mother and Father for Family School. The [c]ourt took notice that Child received special instruction and occupational therapy through ChildLink.

On October 9, 2012, a Family Service Plan (FSP) meeting was held. [Child's] permanency goal was return to parent. The FSP parental objectives were: to attend parenting classes as scheduled; to participate in mental health evaluations; to comply with all treatment recommendations including therapy and/or medication as prescribed; that Mother will attend a feeding clinic; to attend Family School on a weekly basis; to attend scheduled visits; and that Mother will attend a parenting capacity evaluation. Mother attended the meeting. . . .

On November 5, 2012, the [c]ourt took notice that Mother was moderately compliant with the permanency plan [and] that Mother attended mental health counseling and Family School. . . . The [c]ourt noted that Child was a medically needy child, and Mother was to receive training for his medical needs.

On January 2, 2013, the [c]ourt took notice that the parents had substantially complied with the permanency plan. The [c]ourt ordered parents to sign the necessary

consents for Child to have tubes placed in his ears. The [c]ourt further ordered Mother to attend Family School. . . .

On February 7, 2013, Mother completed a parenting capacity evaluation with Dr. Stephen Miksic. Mother was diagnosed as suffering from paranoid schizophrenia. It was noted that Mother had difficulty with communication, that her words were slurred and difficult to understand at different periods of the evaluation, and that she had difficulty focusing attention or concentrating on the conversation. It was recommended that visits between Mother and Child be closely supervised and suspended or cancelled if Mother exhibits disorganized behavior or a response that is clearly disturbing or upsetting to Child. The recommendations further stated that if there was a pattern of disruptive unresponsive behavior from Mother, it would be in Child's best interest to cancel visits until she was able to seek treatment to improve her ability to respond in a coordinated and organized manner. Dr. Miksic noted that Mother needed more intensive involvement with psychiatric treatment and will likely not improve in her mental status without compliance involving psychotropic medication.

On March 11, 2013, a FSP meeting was held. [At this time, it had been a year since DHS first received the GPS regarding Child. Child was approximately two years and one month old. Child's] permanency goal was changed to adoption. The FSP parental objectives were: . . . that Mother will participate in mental health evaluation[,] comply with all treatment recommendations including therapy and/or medication as prescribed[,] attend the feeding clinic as needed[, and] attend Family School on a weekly basis; [and] that the parents will attend supervised visits[.] The parents failed to attend this meeting.

On April 4, 2013, the [c]ourt took notice that Mother was not attending Family School consistently and ordered that she re-engage with Family School and that a report be provided at Child's next dependen[cy] hearing. Mother was referred to BHS for psychiatric evaluation. . . . The court took notice that Mother was compliant with the permanency plan[.]

On June 10, 2013, the [c]ourt took notice that Mother was compliant with the permanency plan . . . . The court took notice that Child was diagnosed as suffering from a seizure disorder and received on-going medical care. The [c]ourt referred the parents to BHS[.]

. . . Mother failed to comply with objectives designed to facilitate reunification with [Child]. Mother failed to fully comply with her FSP objectives. Mother attended some programs but the quality of her understanding of the materials presented was minimal. She was unable to put in practice what she learned. Mother has a history of severe mental health issues and has failed to fully address these issues with proper treatment and medication. Mother also failed to attend Family School on a consistent basis.

Trial Ct. Op., 4/11/14, at 1-3 (some references to Father's goals omitted).

On January 16, 2014, DHS a filed petition to change the goal to adoption. Following a hearing on February 4, 2014, the trial court granted DHS's petition and changed Child's goal to adoption. Mother timely appealed on March 4, 2014.[2]

Preliminarily, we *sua sponte* review whether Mother had notice that DHS sought termination of her parental rights.[3] In its opinion, the trial court

---

[2] Mother and the trial court complied with Pa.R.A.P. 1925.

[3] This Court has stated that a goal change and termination are distinct procedures:

"[A] placement goal change to adoption [under § 6351(f) of the Juvenile Act] does not terminate the parent's rights; however, it is a step in that direction." The next step in the direction of termination is the filing of a Petition for Termination of Parental Rights which is controlled by the

stated, "DHS filed termination petitions on January 16, 2014." Trial Ct. Op. at 4. The official trial court docket includes these separate entries for that date: "**Notice** of Filing of Petition to Terminate Parental Rights Re: N/M" and "Goal Change Petition Filed." Detailed Docket, printed 4/14/14, at 7 (emphasis added). However, the certified record includes only a petition for goal change.[4] This petition, as well as the accompanying proposed "Findings of Facts and Conclusions of Law," discuss only a goal change to adoption. DHS' Pet. for Goal Change to Adoption, 1/16/14, at ¶¶ 6-7; DHS' Findings of Fact & Conclusions of Law, 1/16/14, at ¶¶ 3.

Nevertheless, at the beginning of the hearing nineteen days later, on February 4, 2014, DHS' counsel stated, "[P]reliminarily, if I may read the vital statistics as stated in the **Involuntary Termination Petition** . . . regarding [Child.]" N.T., 2/4/14, at 5 (emphasis added). Mother made no objection or any indication that she was not aware of DHS' intent to pursue termination. **See id.** at 5-6. Accordingly, and in light of the fact that

---

Adoption Act, . . . and not the Juvenile Act. The focus in change of goal to adoption proceedings is the needs and welfare of the child[.]

**In re Adoption of S.P.**, 32 A.3d 723, 732 n.11 (Pa. Super. 2011) (en banc) (cittions omitted), appeal rev'd on other grounds, 47 A.3d 817.

[4] The "List of Record Documents," acting like a table of contents for the certified record, likewise includes only a "Petition for Goal Change to Adoption filed 01/16/14." List of Record Documents, at 2.

Mother has raised no issue concerning notice before the trial court or this

Court, we proceed to a review of her appellate claims.

Mother raises the following issues for our review:

> 1.   Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights where the evidence showed that Mother substantially complied with the [FSP] goals established by [DHS], and where DHS failed to provide adequate services to assist [M]other [to] remedy the conditions that brought [Child] into care?

> 2. Did the trial court commit an error of law and abuse of discretion by voluntarily terminating [Mother's] parental rights where [DHS] failed to prove by clear and convincing evidence that involuntarily terminating [Mother's] parental rights would best serve the emotional needs and welfare of [Child]?

> 3.   Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights without fully considering the impact of termination on the emotional needs and welfare of [Child]?

> 4.   Did the trial court commit and error of law and abuse of discretion by changing the permanency goal of [Child] from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for [Child's] needs and welfare?

Mother's Brief at 2-3.

Our standard and scope of review is well-established:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions.  However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent

evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). "[O]ur standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

Furthermore:

> Termination of parental rights is controlled by statute. *See* 23 Pa.C.S.A. § 2511[.]. Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (some citations omitted).

We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to

determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. . . .

*In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006) (citations

omitted).

Section 2511 of the Adoption Act, which sets forth grounds for

involuntary termination, provides in pertinent part:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence

necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b). This Court "need only agree with [a trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

For her first issue, Mother claims the court erred in terminating her parental rights under both subsection 2511(a) and 2511(b). She avers that "DHS presented little evidence about [her] efforts or abilities" to care for Child. Mother's Brief at 11. Instead, Mother alleges, DHS "relie[d] on Dr. Miksic's testimony . . . and asks this Court to infer that [her] psychiatric problem renders her currently incapable of caring for [Child] and that [she] cannot or will not obtain the necessary psychiatric assistance[.]" *Id.* at 11-12. With respect to subsection 2511(a)(2), Mother contends DHS failed to show she evidenced a settled purpose of relinquishing a parental claim or failed to perform parental duties. Mother avers that she "has substantially complied with all of her FSP goals," "including attending the ARC, attending

Family School, visiting with [Child], and participating in mental health therapy." *Id.* at 14. She also claims DHS failed to show she is unable or unwilling to remedy the conditions that led to Child's removal, or that her mental health problems make it impossible for her to properly parent Child. We disagree.

The Pennsylvania Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

> . . . § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent." . . .

*In re S.P.*, 47 A.3d at 827.

Psychologist Stephen Miksic, Ph.D., performed Mother's parenting capacity evaluation in February 2013. At the goal change hearing, he testified about Mother's history of mental illness, specifically paranoid schizophrenia with auditory hallucinations. N.T. at 9-16, 22-23. Dr. Miksic also testified to the following. Mother's prognosis for reaching her FSP goals was poor, "based on [his] observations of her direct behavior and the long standing history [Mother] had of difficulty responding to psychiatric treatment and denial generally of the severity of her disorder and resistance to treatment." *Id.* at 15. Mother had stated she took psychotropic

medications in the past, did not find them helpful, but "knows that it is appropriate or would be helpful for her to meet other people's expectations" and tells people she is taking medication when she is not. *Id.* at 12. Dr. Miksic concluded that Mother "was not in a position to directly or independently supervise the care and management of a child" and that he had a "very low expectation that [Mother] would be able to respond to treatment and improve . . . ." *Id.* at 16.

Mother's Family School caseworker, Maurice Rentie, testified that Mother began the Family School program on October 24, 2012 and Mother and Child were provided services for about a year. *Id.* at 24-25. Mr. Rentie described Mother's attendance at only thirty-eight of sixty-eight visits as "inconsistent."[5] *Id.* at 25. Mother was discharged from the program effective October 9, 2013, after a verbal altercation with the program's parent educator. *Id.* at 27. Mr. Rentie described Mother as attempting to develop a bond with Child, but finding it difficult to do so because Child often had tantrums. *Id.* at 28. Mr. Rentie testified that Mother's attempts to redirect Child's behavior were appropriate, but his tantrums were only diffused with the assistance of program staff members. *Id.* at 28-29. According to Mr. Rentie, Child was affectionate towards Mother when she was consistent in attending visits with him. *Id.* at 29-30. Mr. Rentie also

---

[5] In her brief, Mother refers to this same figure, of attending thirty-eight of sixty-eight Family School sessions, as positive evidence of her efforts. Mother's Brief at 13.

noted that Mother reported to him that she did not need, and was not taking, the medication prescribed to her as part of her mental health treatment. *Id.* at 28.

Ade Adewuole, Child's Juvenile Justice Center caseworker, testified to the following regarding his observations of the interaction between Mother and Child. Mr. Adewuole had concerns about Mother's attention during their visits: "I don't know what was going on in her mind. There were times that she might just be lost for five minutes or so. . . . And there were times like her mind would not be here [sic], but then she would come back." *Id.* at 39. Incidents such as this occurred approximately two times in a two-hour visit. *Id.*

Linda McLean, Child's DHS social worker since April 2012, testified to the following. At the time of Child's initial placement with DHS, including the time of Child's fall on March 17, 2012, Mother was not taking her medication. *Id.* at 42. Ms. McLean described Mother as disruptive and "a little irrational" during their interactions. *Id.* at 43. Mother's FSP goals included: (1) attend supervised visits on a weekly basis; (2) attend therapy on a weekly basis; (3) have a parenting capacity evaluation; (4) attend Family School and parenting education; (5) participate in mental health evaluation and comply with all treatment recommendations; (6) attend Feeding Clinic with Child's foster parent as scheduled; and (7) attend Child's medical appointments with Child's foster parent, if necessary. *Id.* at 44-45,

48. Mother completed parenting education, attended Family School, and participated in a parenting capacity evaluation, but only attended scheduled visits infrequently. *Id.* at 47. Mother never progressed to having unsupervised visitation with Child because she did not show she was ready for unsupervised visits. *Id.* at 46-47. Mother told Ms. McLean that "she feels as though she doesn't need to take any medication." *Id.* at 49. Importantly, Ms. McLean testified that she believes that changing Child's permanency goal to adoption is in Child's best interests because Mother is unable to care for Child safely on a daily basis because of her mental health issues and failure to comply with treatment recommendations, including taking medication. *Id*. at 48-49.

Mother also testified at the hearing to the following. When asked why she "only made a little more than [a] third of" her visits with Child in the past three months, she replied that she was under stress and had insomnia and a sleep disturbance. *Id.* at 57-58. Mother told Dr. Miksic that she no longer had schizophrenia, and was cured as follows:

> Oh, I was started going to church in around 2007 or 2006 and I received a whole lot of prayer and it went through[ ] stages of healing. So, like when I say I received healing what you call that—I can't pronounce it—auditory hallucinations, I don't hear those anymore and I do not visually—have visual hallucinations. . . .

*Id.* at 60.

In considering subsection 2511(a)(2), the trial court found the testimony of DHS' witnesses credible and concluded:

In the instant case, Child's Mother has been under repeated and continued incapacity to provide for the needs of [ ] Child. Dr. Stephen Miksic's testimony established that Mother was diagnosed with paranoid schizophrenia. Mother has suffered hallucinations for a period of seven or eight years. The same testimony established that Mother's ability to sustain independent living without the support of others is limited. Mother is not in a position to directly and independently take care of her child. DHS social worker [Linda McLean] also stated that Mother's behavioral and mental issues limit Mother's capability to take care of [ ] Child on a daily basis.

Mother's incapacity causes [ ] Child to be without the essential parental care. Mother was diagnosed with schizophrenia and she stopped taking her medicine. Child fell on March 17, 2012, at a friend's house. Mother admitted: "[H]e fell down the stairs because he was walking around, and I was not paying attention." As a result [ ] Child hit his head, but Mother did not take him to the hospital. When questioned about why she did not take [ ] Child to the hospital, Mother stated: "I was babysitting another baby," and "I did not feel that—well, at the moment, I did not—like he seemed to be awake, I was not thinking about it."

In regards to the probabilities of recovery, Dr. Miksic stated: "[I]n accordance to the chronicity of the disorder and resistance to the treatment, there is a very low expectation of improvement." Dr. Stephen Miksic's testimony also emphasized that paranoid schizophrenia is a metabolic and neurological issue that is more likely to be persistent and severe. [Linda McLean's] testimony also established that due to Mother's conduct, visitation could not be modified from supervised to unsupervised.

*   *   *

The testimony reflects that Mother was provided with reasonably available services, but even with the services the conditions that led to placement of [ ] Child were not remedied. [ ] Child has been in placement since March 27, 2012. After all these months, Mother is still not able to complete her objectives, and to place in practice what she

> has learned from the services provided. Mother's inability to take advantage of the services offered and her lack of compliance makes her unable to remedy the conditions that led to Child's placement within a reasonable period of time. [ ] Child needs permanency. Adoption is the new goal because it best serves the needs and welfare of [ ] [C]hild.
>
> . . .DHS met its burden by clear and convincing evidence that [ ] Child has been out of care of [ ] Mother for twelve months or more, and the conditions leading to the placement still exist, and therefore termination would best serve the needs and welfare of [ ] Child.

Trial Ct. Op. at 6-7 (citations omitted).

After careful review, we determine the record supports the trial court's conclusion that DHS proved by clear and convincing evidence that Mother has not, within the requisite statutory period, resolved the issues that led to her inability to parent Child. Although Mother completed some of her FSP goals and visited Child, she continues to deny that she has serious mental health issues. Furthermore, she chooses not to take her medication, but informs people that she does. Therefore, we agree with the trial court that Mother's incapacity to parent persists. On appeal, Mother seeks to have this court re-weigh the evidence in her favor. Our standard of review, however, does not permit us to invade the credibility determinations of the trial court and re-weigh the evidence, absent an abuse of discretion. *See In re S.P.* 47 A.3d at 826. We find no abuse of the court's discretion in concluding that DHS sustained its burden to show grounds for termination under Subsection 2511(a)(2). *See id.* In so finding, we need not address the trial court's

determinations under Subsections 2511(a)(1), (5), or (8), *See In re B.L.W.*, 843 A.2d at 384.

We address Mother's next two issues together, which challenge the trial court's conclusions under Subsection 2511(b). She asserts "the evidence is clear that [she] and Child have an ongoing relationship," and that she visits Child often. Mother's Brief at 17. Mother claims the court erroneously "substitute[ed] its opinion that [she] could not care for [Child] for an analysis of the parent-child relationship." *Id.* at 20. She reasons that any finding that she is unable to care for Child is not an appropriate inquiry under Subsection 2511(b) as to the Child's needs and welfare. Finally, Mother contends that the only evidence about the effect of termination on Child came from DHS social worker Ms. McLean, and her opinion—that termination would not have a negative impact—was based on Child having a strong bond with his foster parent. *Id.* at 20, 21. We find no relief is due.

With regard to Section 2511(b), this Court has stated:

> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be

considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. **See In re T.D.**, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (some citations omitted).

In the case *sub judice*, the trial court concluded that termination of Mother's parental rights was in Child's best interest:

[Ms. McLain's and Mr. Adewuole's] testimonies established that a very strong bond exists between foster parent and Child, while Mother struggles to call Child's attention. The Child never seems to call his biological Mother "Mom." Mother's bond with the Child is more of a casual relationship and not a parent/child bond. No harm would be suffered by the Child if the foster parent adopts Child and he never sees his biological mother again. It should be noted, the Child's development has improved under foster parent's care because foster parent provides for his needs and welfare.

Trial Ct. Op. at 7.

The court's opinion belies Mother's contention that it failed to consider Child's best interests, emotional needs, and welfare. The court specifically found "that severing any parent/child bond will not cause irreparable harm to the Child. It is in the best interest of the Child's safety, protection, mental, physical and moral welfare, to terminate the parental rights of Mother." **Id.** at 8. Although Mother attended some visits with Child, the trial court credited DHS' evidence that Child's interests would be best served by terminating Mother's parental rights. **See In re Z.P.**, 994 A.2d at 1121.

After review of the record, we find no abuse of discretion.

For her last issue, Mother claims the trial court erred in changing Child's placement goal from reunification to adoption. Mother again asserts the court failed to consider the bond Child had with her, and contends there was no bonding evaluation conducted. Mother's Brief at 23. We hold No relief is due.

This Court has stated:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. . . . We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.
>
> Next, we note that in matters of placement for a dependent child, the trial court must be guided by the best interests of the child—not those of his or her parents.
>
> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act[, which] place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.
>
> At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved. [42 Pa.C.S.A. § 6351(f)].

\* \* \*

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

*In re A.K.*, 936 A.2d 528, 532-33 (Pa. Super. 2007) (some citations omitted).

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

Finally, in an appeal reviewing the involuntary termination of parental rights, this Court has stated, "In analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal

bonding evaluation be performed by an expert." ***In re K.K.R.-S.***, 958 A.2d

529, 533 (Pa. Super. 2008).

In responding to Mother's challenge to the goal change, the trial court

found the following:

> The record clearly reflects that DHS made reasonable efforts to reunify the Child with his Mother. Reasonable efforts were found by the court in the Permanency Review Hearings on July 3, 2012; August 6, 201[2]; November 5, 2012; January 2, 2013; April 4, 2013, and June 10, 2013. DHS provided reasonable and adequate services to Mother. DHS developed a [FSP] on September 10, 2012. . . . All the services were provided to help Mother reunify with her Child. The same goals and services were confirmed in the FSP issued on March 11, 2013.
>
> Dr. Stephen Miksic's testimony was credible and honest in establishing that Mother's ability to sustain independent living without the support of others was limited. Mother was not in a position to directly and independently take care of her Child. . . . [Ms. McLean] confirmed that Mother's behavioral and mental issues impeded her capability to take care of the Child on a daily basis. In spite of all the services provided, [Ms. McLean's] testimony was that, due to Mother's incapability to take care of the Child, changing the permanency goal to adoption is in the Child's best interest.
>
> The trial court determined that Dr. Stephen Miksic['s, Ms. McLean's, and Mr. Adewuole's] testimonies were credible. Consequently, the [c]ourt found that it was in the best interest of the Child to change the goal to adoption. Looking at all the circumstances and considering all the explanations offered by Mother, the trial court found that in spite of Mother's compliance with her [FSP] between November 2012 and June 2013, it cannot be ignored that in dependency cases, the focus is on the [c]hild and not on the parent. The Child deserves permanency.

Trial Ct. Op. at 8.

After review of the record and relevant law, we conclude that the trial court did not abuse its discretion in concluding that a goal change to adoption was in Child's best interests.  ***See In re A.K.***, 936 A.2d at 532-33. We further find that a lack of a formal bonding evaluation is not grounds for relief.  ***See  In re K.K.R.-S.***, 958 A.2d at 533.  Accordingly, we affirm the trial court's decree granting the petition to terminate Mother's parental rights and change Child's goal to adoption.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/29/2014